[Civ. No. 3254.   Fourth Dist.   Jan. 30, 1945.]

ADOLPH THOMAS, Respondent, v. STELLA R. WHITE, Appellant.

Ray H. Overacker and George B. Bush for Appellant.

Harvey, Rimel & Harvey for Respondent.

BARNARD, P. J.—This is an action to quiet title to real property as against any rights of the defendant arising out of certain contractual relations between her deceased husband, D. R. White, and the plaintiff.

D. R. White and the plaintiff executed a written agreement dated January 10, 1938. By way of preamble it recited that the plaintiff owned certain land upon which was an oil well which was not then in production; that he proposed to recondition and redrill said well so as to place it on production by a process known as "gravel pact"; that White claimed to be an experienced driller, familiar with the reconditioning and drilling of oil wells, and familiar with the process known as the "gravel pact"; and that he was willing to undertake to recondition and place said well on production on the terms thereafter mentioned. It was then mutually agreed that the owner would furnish the land, well, machinery and equipment and approximately $10,000 for the purpose of reconditioning and placing said well on production by what is known as the "gravel pact" process; that White would "take full charge of work in connection with the reconditioning and placing of said well upon production" and would serve without salary except for $5.00 a day for actual expenses during the reconditioning; that when the well was placed on production

the owner would pay to White 10 per cent of the net production as the oil was sold, the same to continue while the well remained pumping and producing oil in paying quantities, it being agreed that "paying quantities" would mean an output of oil of not less than 50 barrels a day over a production test of thirty consecutive days, and provided that the owner would not be required to operate the well when the production was less than 50 barrels a day. It was then agreed that White would give his personal supervision and attention during the drilling and reconditioning of the well; that after the well was placed on production he would visit the well as often as necessary to "check the production thereof for the benefit of the parties hereto"; that if White failed to put the well on production or the well failed to produce oil in paying quantities, as therein defined, the agreement should be null and void; that White should keep records of operations, costs and sales, which would be open to the inspection of the owner; and that the terms of the contract should extend to the heirs, executors, administrators and assigns of the parties.

It appears that on account of bad pipe White could not get to the bottom of the old well and was therefore unable to proceed by the "gravel pact" process. By some sort of understanding between the parties arrived at about March 1, 1938, it was decided to redrill the well, using the old hole and pipe for the first 700 feet and from there on drilling a new hole to the required depth. This was done and a well was brought in on May 17, 1938. Thereafter, two pumpers operated the well, White visited the well occasionally, and the well was continuously operated although no thirty-day production test was ever made. Each month the plaintiff paid White 10 per cent of the net proceeds, marking the checks to indicate that it was his royalty, and each check was accompanied by a statement showing the sales, expenses and net proceeds. By some sort of an agreement between the parties a second well was drilled or reconditioned and placed on production about September, 1938. After that the plaintiff paid White 10 per cent of the net production of both wells.

On August 12, 1939, White died suddenly, and his estate was duly set aside to the defendant as his widow. After White's death the plaintiff gave to the defendant statements and checks covering the production for July, August and September, 1939, the checks being marked as her 10 per cent royalty. About October 1, 1939, he offered to give the defen-

dant $50 a month for three months, but denied any further liability under the contract.

In this action which followed, the defendant, by answer and cross-complaint, claimed the right to a continuance of the 10 per cent royalty payments so long as the well was operated. The plaintiff introduced his deed to the land and the written agreement into evidence, testified that the well had not been reconditioned by the ''gravel pact'' process and that it had never produced an average of 50 barrels per day, and rested. Before that the court had stated that he would hold that the contract called for the reconditioning of the well by the ''gravel pact'' process, and that it called for no payments to White unless the well produced an average of 50 barrels a day over a thirty-day period. It appears from the evidence that the well actually produced from 1,000 to 1,300 barrels a month.

Apparently because of the court's rulings in the respects noted the defendant called the plaintiff as a witness under section 2055, Code of Civil Procedure, and brought out the fact that certain conversations had taken place between the plaintiff and White about March 1, 1938, and later in connection with the second well. These conversations were then thoroughly gone into by counsel on both sides. In this connection the plaintiff testified to facts which, if true, show that at the first of these conversations it was agreed that the written contract should be cancelled; that they would proceed to redrill the old hole on a different arrangement; that White would do the work without salary except the same expense account of $5.00 a day; that in lieu of salary he would be paid 10 per cent of the net proceeds of the well during such time as the well should be operated regardless of the amount of oil produced, but with the further agreement that White would act as ''superintendent'' while the well was on production and that the 10 per cent should be paid him only so long as he continued to act as such superintendent. With respect to the second conversation he testified that a similar arrangement was made with respect to the drilling or redrilling of the second well.

The court found in all respects in favor of the plaintiff finding, in particular, that under the terms of the written agreement the plaintiff was not obligated to pay 10 per cent of the production to White because the well had not been

742

placed in production through the "gravel pact" process and because the well had not produced an average of 50 barrels a day; that White had not performed his part of this contract for these reasons; that before any oil was produced that contract was cancelled and rescinded by the mutual consent of the parties; that the amounts later paid to White by the plaintiff were not paid under said agreement, but were paid under two subsequent oral agreements, which later agreements terminated on the death of White since he was no longer able to continue to perform the obligations thereof; that the payments to the defendant after the death of White were not paid under the written agreement but were paid solely as an act of kindness and gratuity; that after the death of White the defendant had no interest in the existing agreements; and that performance on the part of White had never been waived by the plaintiff. Judgment was entered quieting title in the plaintiff and denying any relief to the defendant, and from that judgment the defendant has appealed.

The appellant first contends that the death of D. R. White did not terminate this agreement; that any personal obligation imposed upon him thereby had been discharged; that the continuing duties were of a character which did not call for his personal services, and their performance by other persons was contemplated by the contract; and that, in any event, any right to terminate the agreement upon the death of White was waived by the acts and conduct of the respondent. It may be conceded that all of these things are true or would be true if we were concerned only with the rights of appellant as owner of the original written agreement and with the effect of that agreement in the light of the subsequent action of the parties thereto. A different situation is presented if, as found by the court, this written contract was cancelled before the well was put on production and another and different agreement was entered into.

It is next contended that any obligation on the part of White to bring the well in by the "gravel pact" process and any provision in the contract for the payment of a royalty only while the well was producing oil in the average amount of 50 barrels a day were waived by the acts and conduct of the respondent, and that the court's findings to the contrary are not supported as a matter of law. While the written contract seems to have contemplated a reconditioning of the oil well by a system known as the "gravel pact" process, the

portion thereof which sets forth what White agreed to do in this connection merely provides that he was to take charge of the work necessary to recondition and place the well upon production. It can hardly be said that the contract provided absolutely for the reconditioning of the well by the "gravel pact" process and in no other manner or if this could be said it appears, without dispute, that this requirement was either waived or changed by some subsequent agreement of the parties. ■ We also think the court erred in interpreting the written contract as providing that the 10 per cent royalty need not be paid unless and until the production of oil averaged 50 barrels a day. The reasonable construction of the language used is that this royalty would be paid so long as oil was produced and sold, but that the owner was under no obligation to operate the well if the production did not average 50 barrels a day. In any event, no production test as agreed upon was ever made and production was continued although it amounted to less than 50 barrels a day on the average. The court could well have found that these two provisions of the contract were waived, and it would have been reversible error not to so find had it not been for the evidence of the subsequent conversations and agreements of the parties, which evidence was first and largely brought out by the appellant.

■ The final contention is that the court's "apparent finding of a novation or oral modification cannot be supported." It cannot be questioned that the evidence of respondent, if accepted as true, fully supports the findings that the written agreement was cancelled and that a new and slightly different contract was entered into and that one of the terms of the new agreement was to require the personal attention of White as superintendent of the two wells. Among his duties as superintendent were to keep the wells in operation, to make repairs, to clean out the wells when they sanded up and to attend to all things necessary to keep the wells operating. Most of these duties were not called for in the written agreement. The appellant argues that there could have been no novation, under the law, because the new oral contract was void since it was not to be performed within a year and since it created an interest in real property. While it might be void after the death of White for these reasons this is an argument against the right of the appellant to a

continuing interest in the production of this well. There can be no question that the agreement was fully executed up to the time White died. It is also argued that the "oral modification theory" is unsupportable because the new or changed contract did not require anything in addition to the requirements of the written contract. It required a redrilling or reconditioning of the well in a manner different from that originally contemplated and, if the testimony of the respondent is to be believed, it required considerably different services on the part of White after the well was put on production. There is also evidence that the well as completed cost $32,000 instead of the $10,000 originally contemplated.

While the facts testified to by the respondent seem improbable it cannot be said that they are impossible and nothing appears in the record from which it can be said, as a matter of law, that this testimony was unworthy of any belief. The question was one of fact for the trial court and the findings necessary to the decision are all supported by the evidence of the respondent. While all of that testimony is with regard to things which could not be contradicted because the only other party present at the conversations was dead, the matter was largely brought out and entirely opened up by the appellant. The findings could well have been to the contrary and we would like to reverse the judgment, but we have been unable to find any legal reason for doing so under the established rules of law.

For the reasons given, the judgment is affirmed.

Marks, J., and Griffin, J., concurred.

A petition for a rehearing was denied February 19, 1945, and appellant's petition for a hearing by the Supreme Court was denied March 29, 1945.